In the

# United States Court of Appeals
### For the Seventh Circuit

———————————

No. 18-3217

BRIGID A. FORD,

*Plaintiff-Appellant,*

*v.*

MARION COUNTY SHERIFF'S OFFICE, *et al.,*

*Defendants-Appellees.*

———————————

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:15-cv-1989-WTL-DML — **William T. Lawrence**, *Judge.*

———————————

ARGUED SEPTEMBER 5, 2019 — DECIDED NOVEMBER 15, 2019

———————————

Before SYKES, HAMILTON, and SCUDDER, *Circuit Judges.*

HAMILTON, *Circuit Judge.* Plaintiff Brigid Ford worked as a deputy in the Marion County Sheriff's Office until her hand was seriously injured in a car accident while on duty. After assigning Ford to light duty for about a year, the Sheriff's Office told Ford that she must either transfer to a permanent position with a cut in pay or be terminated. After some back and forth, Ford accepted a civilian job as a jail visitation clerk. In the following years, Ford alleges, she suffered disability-

based harassment by co-workers, refusals to accommodate her scheduling needs, and several discriminatory promotion denials. Ford sued the Sheriff's Office for discriminatory employment practices in violation of the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. § 12101 *et seq.*

The district court granted summary judgment on most of Ford's claims. Two claims were tried to a jury, which rendered a verdict for the defense. Ford has appealed and raised a host of issues. We affirm. The district court correctly granted summary judgment on numerous claims and committed no reversible error in the trial.

I.  *Factual and Procedural Background*

Ford had worked at the Sheriff's Office for almost a dozen years when, in April 2012, another driver ran a red light and crashed into her patrol vehicle. Since 2008, Ford had worked as a sworn deputy sheriff in the warrants unit, locating and arresting people with outstanding warrants. The crash severely injured Ford's dominant right hand. Despite extensive treatment, she has not recovered full use of her hand. She suffers ongoing and sometimes debilitating pain in her lower arm.

In the wake of the accident, the Sheriff's Office placed Ford on various light duty tasks for about a year while she pursued treatment. It became clear that Ford physically could not resume her work as a deputy sheriff, in the warrants unit or otherwise.

A.  *Demotion to Visitation Clerk*

In June 2013, Angela Grider, the Sheriff's Office's director of human resources, and Eva Talley-Sanders, the chief deputy, held a meeting with Ford that she calls the "three choices"

meeting. Ford's claims based on the ensuing events were re-solved on summary judgment, so we recount the facts in the light most favorable to her. See *Brown v. Milwaukee Board of School Directors*, 855 F.3d 818, 820 (7th Cir. 2017). Grider and Talley-Sanders told Ford that she could either (a) accept a ci-vilian clerk position in the Main Control office with a cut in pay, (b) resign, or (c) be fired.

The day after the meeting, Ford sent Grider an email re-questing accommodation under the ADA. Ford said that she wanted to work and believed she could do so with reasonable accommodations for her complex regional pain syndrome. She asked for the "ADA form" for her doctor to fill out. Over the following weeks, Ford and Grider emailed back and forth concerning Ford's request for accommodation and whether the clerk position would suit her needs and abilities.

In a July 12 letter, Ford described accommodations that she believed might enable her to perform the main control clerk job. She requested a hands-free telephone, voice-acti-vated software for her computer, an ergonomic work station, the ability to take breaks when needed to alleviate her pain, and training for her supervisors. Two months later, Grider re-sponded in a letter granting each of these requests except the voice-activated software.

The final exchanges concerning Ford's ultimate placement occurred in late September. Ford sent an email to Grider on September 20, 2013 asking if the Main Control clerk was the only open civilian position. Grider responded that it was the "only position where we are able to meet the limitations of your request." Ford persisted, asking if Grider could provide her with a list of open civilian positions. Grider did not re-spond to this request. Three days later, Ford emailed again to

accept the position as a Main Control clerk. Only then did Grider respond. She described Ford's pending requests about other possible assignments as "now a moot issue." Ford then shadowed other workers in various clerk roles, including "basement control," "book-out," and jail visitation. She ultimately accepted a position in the Visitation Office starting on October 3, 2013.

B.  *Conflict with Co-Workers in the Visitation Office*

Ford alleges that in her work in the Visitation Office, she suffered almost three years of disability harassment. She clashed repeatedly with her co-workers, first Carol Ladd and Eva Watts, who worked in the Visitation Office from October 2013 to December 2014, and later with Vashni Hendricks, who worked there from January 2015 to July 2016. Ford contends that these conflicted relationships and the Sheriff's Office's failure to address them created a hostile work environment based on her disability.

Before turning to the facts of the alleged disability harassment, we note the split procedural posture of this claim. On summary judgment, the district court found that no reasonable jury could impose liability on the Sheriff's Office based on the evidence of harassment by Hendricks from January 2015 to July 2016, primarily because Ford did not alert supervisors that the friction stemmed from Hendricks's hostility to her disability. The court denied summary judgment, however, based on the evidence of the earlier harassment by Ladd and Watts. The jury ruled for the Sheriff's Office. Section II of this opinion addresses the propriety of dividing Ford's hostile work environment claim. For now, we summarize both the facts that were before the jury and Ford's account of Hendricks's conduct.

Ford and Ladd had disputes from the start. On October 3, 2013, Ford's first day in the Visitation Office, Ford went to Grider and "broke down in tears" describing Ladd's alleged bullying, unhelpfulness, and insensitivity to Ford's disability. At trial, Grider testified that she discounted this allegation because Ladd did not "even know about [Ford's] disability at that moment." Ladd testified and denied that she had made any disparaging remarks to Ford on that date. Over the next four months, Ford did not make any written complaints, but she testified at trial that Ladd was harassing her constantly during that time. Ford testified that Ladd mocked Ford's workstation accommodations, adjusted Ford's chair into uncomfortable positions, and disrupted work with loud speakerphone conversations.

At the start of February 2014, Ford sent the first of many written complaints to one of her supervisors, Lieutenant James Walterman, regarding Ladd's behavior. Watts began working with Ford and Ladd in the Visitation Office after that, and Ford testified that Watts began harassing her as well. Ford relied on a tally of her emails and memos to Walterman as proof of the disability harassment and the failure of the Sheriff's Office to address it. Lieutenant Walterman acknowledged at trial that he received three memos from Ford reporting, among other things, that Ford used more pain medicine because of Ladd's animosity, that Ford overheard Ladd disparaging her disability, and that Ladd pushed Ford physically with her chair. Ford offered as evidence a total of fifteen memos and emails to Lieutenant Walterman during this time with similar allegations.

The Sheriff's Office argued at trial that these memos reported only ordinary disputes about how to do the work of a

visitation clerk rather than complaints of disability harassment. Walterman testified that he believed Ford took issue with how Ladd did her work. Two other co-workers—not otherwise involved in the suit—testified that Ford, Ladd, and Watts argued a lot about how to do the work correctly. Walterman also testified that he believed any bumps between co-workers in the cramped Visitation Office were inadvertent.

Ford's memos themselves lent some support to the Sheriff's Office defense. Ford complained that Ladd was too permissive with inmates' visitors, that she made personal calls at work, that she criticized Ford's leaving callers on hold, and that she did not say good morning. Ford complained that Watts left early and took work documents home, and that she told Ladd to ignore Ford.

The Sheriff's Office ultimately decided to transfer Ladd and Watts out of the Visitation Office effective December 27, 2014 and January 3, 2015, respectively. At trial, Ford said that Ladd and Watts's departure "remedied" their conflict.

The jury concluded in a special verdict that Ford was "subjected to negative comments and behavior by Ladd and Watts," and that "this conduct by Ladd and Watts was unwelcome." But the jury then found that Ford had failed to prove that the unwelcome conduct "occurred because of the Plaintiff's disability," thus ruling for the Sheriff's Office on Ford's claim of a hostile work environment. Neither party objected to the use of the special verdict form.

After Ladd and Watts left the Visitation Office, Vashni Hendricks began working there with Ford. Ford alleges that Hendricks immediately began harassing her because of her disability. As noted, the district court granted summary

judgment on this portion of her claim, primarily on the ground that Ford did not alert supervisors that friction with Hendricks had anything to do with Ford's disability. Ford sent two complaints to Lieutenant Walterman, on January 20 and February 13, 2015, shortly after Hendricks arrived. Neither memo mentioned Ford's disability or asserted that Hendricks subjected her to disability harassment. Then, sometime in March 2015, Lieutenant Walterman was replaced by Lieutenant Teri Nesbitt.

Ford cites a few later incidents that also have no apparent link to her disability. On June 19, 2015, Ford wrote an email describing disagreements with Hendricks on visitation policies and asserting that Hendricks's hand lotion made her sick. That same day, Ford told her sergeant, Marvin Johnson, that Hendricks had made a comment "about getting a gun and blowing [Ford]'s brains out." The Sheriff's Office investigated this claim. Hendricks's written response explained that she was describing a mass shooting in the news, not talking about Ford. After reviewing this incident, along with the ongoing animosity between Ford and Hendricks, the Sheriff's Office issued written discipline to both employees.[1] Months later, in February 2016, Hendricks stated that "it's a good thing I don't have a gun," but Ford does not describe much else about this comment.

Ford's disability surfaced during a January 2016 disagreement about whether visitors to the Marion County Jail may

---

[1] Ford received a "letter of reprimand," while Hendricks received only a "letter of caution," because Ford unlike Hendricks had prior disciplinary history. Specifically, Ford had been reprimanded for an incident on January 7, 2013 not otherwise relevant to this case.

use passports as a form of identification. Ford thought not; Sergeant Johnson disagreed. Our accounts of the confrontation come from Ford's complaint to Lieutenant Tia Shanklin,[2] Hendricks's memo to Major Tanesha Crear, and the trial testimony of Crear. Crediting Ford's account, as we must, Ford refused to let a visitor use a passport as identification, but Johnson overruled her. After the visitor had left, Ford began expressing her disagreement to Johnson. At this point Hendricks arrived and berated Ford for "yelling" at her supervisor in front of visitors. In none of the accounts did Hendricks mention Ford's disability. But Ford's disability became an issue when Major Crear intervened in the dispute, saying to Ford that "anyone who was supposedly in as much pain as [Ford] was claiming to be in would not have the energy to be up in front of the Supervisor's desk, waving [her] arms around." Crear reproached Ford for her behavior.

Ford has offered evidence of two instances of alleged harassment where Hendricks mentioned Ford's disability. Both apparently stemmed from Hendricks's resentment that she had to work shifts in both the Visitation Office and the Main Control Office; Ford's disability excused her from the Main Control shifts. First, Ford testified that, in September 2015, Hendricks told her that she should have to prove she was disabled to avoid Main Control duty. Shanklin witnessed this event but told Ford that Hendricks was "just kidding" or "just joking." Second, on June 22, 2016, Hendricks told Ford that she needed to go to Main Control to see just how hard it was. Hendricks also joked that she "caught" carpal tunnel

---

[2] It appears that at some point in July or August 2015, Shanklin replaced Nesbitt as lieutenant for the visitation clerks. The parties do not discuss this second change in supervisors.

syndrome from working over there. Ford described the latter incident in a complaint to Lieutenant Shanklin. The next month, the Sheriff's Office transferred Hendricks out of the Visitation Office as a result of the ongoing conflict between Ford and Hendricks.

C.  *Change to a Rotating Schedule*

The second claim at trial arose from the Sheriff's Office's refusal to adjust Ford's schedule as a reasonable accommodation under the ADA. On January 3, 2015—the same day that Hendricks replaced Ladd and Watts—the Sheriff's Office switched Ford from a fixed to a rotating schedule. Ford requested later that month to be returned to a fixed schedule, saying that the rotating schedule exacerbated her complex regional pain syndrome. Ford attached a physician's note from her doctor to that effect. Grider replied in an email two weeks later denying Ford's request because "it [was] not a reasonable accommodation."

The district court denied the Sheriff's Office's motion for summary judgment on this claim, finding that the Office had not shown an undue hardship as a matter of law under 42 U.S.C. § 12112(b)(5)(A). Ford's arguments on appeal do not dwell on the details of the schedule issue, and we need not do so either. Suffice it to say that the evidence about the positive and negative effects of the schedule change was in conflict, and the jury found for the defense on the ground that Ford had failed to prove that she needed the accommodation of the fixed schedule. The jury did not reach the undue hardship question.

D.  *Ford's Applications for Promotions*

A final set of claims arose from Ford's four unsuccessful applications to be transferred or promoted within the Sheriff's Office between March 2016 and February 2017. Ford argues that all these rejections were illegally based on her disability and/or amounted to retaliation for her earlier protected activity under the ADA. The district judge granted summary judgment for the Sheriff's Office on the failure-to-promote claims, finding that Ford had simply not supported these claims with evidence that would support a reasonable inference of unlawful motive. In August 2017, Ford secured a transfer to the sex- and violent-offender registry unit, where she continued to work for the Sheriff's Office at the time of trial.

II.  *The District Court's Use of Partial Summary Judgment*

Ford's principal argument on appeal is that the district court improperly divided the issues presented in her case. She argues the court erred by granting partial summary judgment on an indivisible claim for a hostile work environment. The Supreme Court's ruling in *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), instructs courts to evaluate each unlawful employment practice as a distinct but indivisible claim, but it did not prohibit the district court's actions in this case. The district court had sound reasons, permitted under *Morgan*, to treat differently the alleged disability harassment by Watts and Ladd, on one hand, and Hendricks, on the other.

A.  *Principles Governing Partial Summary Judgment*

As a general matter, Federal Rule of Civil Procedure 56 has long authorized partial grants of summary judgment. See, e.g., *American Nurses' Ass'n v. State of Ill.*, 783 F.2d 716, 729 (7th Cir. 1986) ("[M]otions for partial summary judgment are

permitted."). The 2010 revisions to Rule 56 make this unmistakably clear. See Fed. R. Civ. P. 56(a), cmt. 2010 Amendment ("The first sentence is added to make clear at the beginning that summary judgment may be requested not only as to an entire case but also as to a claim, defense, or part of a claim or defense."). A district court also may enter an order stating any material fact that is not genuinely in dispute for trial. Fed. R. Civ. P. 56(g). In short, "[r]equests for (and grants of) partial summary judgment, including summary judgment as to fewer than all parties and claims, are nothing new." *Hotel 71 Mezz Lender LLC v. National Retirement Fund*, 778 F.3d 593, 606 (7th Cir. 2015).

In the employment discrimination context, however, the enforcement provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5, have been construed to impose limits on the use of partial summary judgment.[3] Title VII authorizes suit based specifically on an "unlawful employment practice." 42 U.S.C. § 2000e-5(e). In *Morgan*, the Supreme Court considered whether events that took place outside the relevant statute of limitations period could support a plaintiff's claim of discrimination. 536 U.S. at 108–09. *Morgan* held that courts must consider all events that belong to a "single unlawful employment practice," no more and no less, regardless of whether they fell within the statutory time period. *Id*. at 117–18.

In our cases applying *Morgan*, we have ruled that district courts may not splinter a single employment practice even if

---

[3] The ADA incorporates by reference the enforcement provisions of Title VII, 42 U.S.C. § 12117(a), so *Morgan* guides our decision on Ford's ADA claims.

claims based on some of the underlying conduct would no longer be timely on their own. In *Isaacs v. Hill's Pet Nutrition, Inc.*, 485 F.3d 383 (7th Cir. 2007), we reversed a grant of summary judgment on plaintiff's hostile environment claim under Title VII. The plaintiff offered evidence that she had been sexually harassed while on two different teams in the factory where she worked. The district court had divided the claim in two based on the identities of the harassers, finding that claims based on the conduct of the first team were time-barred and that the conduct of the second team was not severe enough to amount to unlawful harassment. We rejected the division, noting that Title VII makes the employer liable for complying with the law, and the evidence showed that the plaintiff had suffered a continuous course of harassment coordinated between the two teams of co-workers. 485 F.3d at 385–86. We emphasized that all of the conduct occurred under the same management, that the plaintiff had complained repeatedly about harassment by both teams, and that management had failed to respond. *Id.*

We followed up on that point in *Bright v. Hill's Pet Nutrition, Inc.*, 510 F.3d 766 (7th Cir. 2007), which involved the same factory as *Isaacs*. We ordered a new trial in *Bright* because the district judge had unduly restricted the evidence of earlier sexual harassment that occurred outside the limitations period and before the employer took disciplinary action against one form of sexual harassment. We explained: "Employers may not turn a practice that *Morgan* deems unitary into two or more distinct practices by calling each subdivision of the workplace a separate 'team.'" *Id.* at 768.

It would be odd if this principle restricted a district court's power to grant partial summary judgment against *untimely*

claims but allowed a district court to slice apart *timely* claims.[4] Whether or not timeliness is at issue, courts may grant partial summary judgment as to different unlawful employment practices in one lawsuit, but not as to part of a single unlawful employment practice. See *Morgan*, 536 U.S. at 118 ("The statute does not separate individual acts that are part of the hostile environment claim from the whole for the purposes of timely filing and liability.").

That principle is easier to state than to apply. How should a district court tell the difference, and was the court's partial grant of summary judgment lawful in this case? We first consider Ford's argument that the court improperly separated different types of ADA claims, and then her argument that the court improperly divided her evidence about Hendricks's harassment from that of Ladd and Watts.

B. *Separating Different Types of ADA Claims*

For purposes of summary judgment, a district court may properly separate from each other claims based on specific adverse employment actions, retaliation, denial of reasonable accommodation, and hostile work environment. These claims require proof of different factual circumstances under different legal tests. A summary of the relevant law demonstrates why courts must treat them as distinct "unlawful employment practices."

The ADA prohibits employment discrimination on the basis of disability. 42 U.S.C. § 12112(a). Like other employment discrimination statutes, the ADA also prohibits retaliating

---

[4] The Sheriff's Office does not contend that any part of Ford's lawsuit was time-barred. Ford filed her first of two charges of discrimination with the EEOC in March 2015.

against employees for asserting their rights. See § 12203(a); see also § 2000e-3(a) (Title VII). The duty to accommodate an employee's disability is specific to the ADA. See § 12112(b)(5). A plaintiff must first show that the requested accommodation is reasonable on its face. That shifts the burden to the employer to prove that the accommodation would impose on the employer an undue hardship as defined by the ADA. See *Majors v. General Electric Co.*, 714 F.3d 527, 535 (7th Cir. 2013); 42 U.S.C. § 12111(9)–(10).

In *Morgan*, the Supreme Court drew a sharp line between claims for "discrete" acts of discrimination and hostile work environment claims. See 536 U.S. at 115. A hostile work environment "occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own." *Id.* Hostile work environment claims have their legal basis in the phrase "terms, conditions, and privileges of employment" present in the ADA and other employment discrimination statutes. 42 U.S.C. § 12112(a); see *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). A hostile work environment exists "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Id.* (citations omitted). "A hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'" *Morgan*, 536 U.S. at 117.

Thus, certain facts may support one type of claim but not another. Our decisions have distinguished among the foregoing categories of claims. See, e.g., *Passananti v. Cook Cnty.*, 689 F.3d 655, 659 (7th Cir. 2012) (reinstating jury verdict for

plaintiff on hostile work environment but not discriminatory termination); *Fine v. Ryan Int'l Airlines*, 305 F.3d 746, 751–52 (7th Cir. 2002) (upholding summary judgment as to discrimination accompanied by plaintiff's verdict on retaliation); *Rehling v. City of Chicago*, 207 F.3d 1009, 1013–14 (7th Cir. 2000) (affirming summary judgment as to reasonable accommodation but not as to discrimination). Distinct legal theories denote independent unlawful employment practices that may be addressed separately.[5]

C. *Dividing the Hostile Work Environment Allegations*

A more difficult question is whether and when a plaintiff's hostile work environment claim comprises more than one unlawful employment practice under the rule in *Morgan*. If the alleged disability harassment by Ladd and Watts, as well as that by Hendricks, all belonged to the same employment practice, then it would have been improper for the district court to grant partial summary judgment as to only Hendricks's conduct. We conclude, however, that Ford's suit presented not one but two disability harassment employment

---

[5] Ford relies on a statement from the unpublished second ruling in *Bright* to discount these rulings: "A hostile work environment is actionable *as* sex discrimination; there are not distinct 'claims' for hostile work environment and sex discrimination." 342 F. App'x 208, 209 (7th Cir. 2009). Quoted out of context, this statement seems to contradict the Supreme Court's holding in *Morgan* that "[h]ostile environment claims are different in kind from discrete acts." 536 U.S. at 115. But the second ruling in *Bright* dealt with an unusual circumstance where the district court had narrowly limited the issues for retrial. Our non-precedential order did not declare, and could not have declared, that all employment discrimination claims must succeed or fail as one at summary judgment.

practices, and that *Bright* and *Isaacs* are distinguishable in this regard.

As a threshold matter, we hold that hostile work environment claims are cognizable under the ADA. The district court followed the decisions of this court that have assumed they are. See, e.g., *Lloyd v. Swifty Transp., Inc.*, 552 F.3d 594, 603 (7th Cir. 2009); *Mannie v. Potter*, 394 F.3d 977, 982 (7th Cir. 2005). At some point, however, extended hypothetical analysis should end. Every other circuit to decide the question has held that it is possible to bring an ADA claim for a hostile environment.

We agree with our colleagues in other circuits that a plaintiff may assert a claim for an illegal hostile work environment on the basis of disability under 42 U.S.C. § 12112(a). The claim's legal basis is simple: Congress wrote the ADA using the language of Title VII, and Title VII recognizes hostile work environment claims. See, e.g., *Fox v. Costco Wholesale Corp.*, 918 F.3d 65, 74 (2d Cir. 2019) (detailing this argument). Five circuits have held that such claims are permitted under the ADA. See *id.*; *Fox v. General Motors Corp.*, 247 F.3d 169, 175–76 (4th Cir. 2001); *Flowers v. Southern Regional Physician Services Inc.*, 247 F.3d 229, 233 (5th Cir. 2001); *Shaver v. Indep. Stave Co.*, 350 F.3d 716, 719–20 (8th Cir. 2003); *Lanman v. Johnson Cty.*, 393 F.3d 1151, 1155–56 (10th Cir. 2004). No circuit has held to the contrary. We adopt the position of our colleagues who have recognized hostile-environment claims under the ADA.[6]

---

[6] The First, Third, Ninth, Eleventh, and D.C. Circuits have assumed without deciding that such claims are possible. See *Murray v. Warren Pumps, Inc.*, 821 F.3d 77, 86 n.1 (1st Cir. 2016); *Walton v. Mental Health Ass'n of Southeastern Pennsylvania*, 168 F.3d 661, 666–67 (3d Cir. 1999); *Brown v. City of Tucson*, 336 F.3d 1181, 1190 (9th Cir. 2003); *Cooper v. CLP Corp.*,

We turn to whether the district court improperly divided a single unlawful employment practice in this case. *Morgan* taught that, in general, "the entire hostile work environment encompasses a single unlawful employment practice," but cautioned that acts bearing "no relation" to one another would belong to separate employment practices. 536 U.S. at 117–18. *Morgan* also said that "certain intervening action by the employer" could sever a hostile work environment claim. *Id.* at 118. It also quoted favorably the Ninth Circuit's reasons to find a single practice in *Morgan* itself: "the pre- and post-limitations period incidents involve[d] the same type of employment actions, occurred relatively frequently, and were perpetrated by the same managers." *Id.* at 120, quoting *Morgan v. Nat'l R.R. Passenger Corp.*, 232 F.3d 1008, 1017 (9th Cir. 2000) (alteration in original). *Morgan* thus signaled that hostile work environments can sometimes be broken apart for legal analysis but did not specify when.

Based on the Court's guidance, our cases interpreting *Morgan*, and cases from other circuits, we can identify "various factors that should guide the *Morgan* 'relatedness' inquiry." *McGullam v. Cedar Graphics, Inc.*, 609 F.3d 70, 81 (2d Cir. 2010) (Calabresi, J., concurring). The simplest factor is time: A significant gap between alleged incidents of discriminatory harassment can sever the hostile work environment claim. See *Milligan-Grimstad v. Stanley*, 877 F.3d 705, 713 (7th Cir. 2017) (finding separate employment practices where spans "as large as two or three years" separated the incidents); *Lucas v.*

---

679 F. App'x 851, 852–53 (11th Cir. 2017); *Hill v. Assocs. for Renewal in Educ., Inc.*, 897 F.3d 232, 236 (D.C. Cir. 2018). The Sixth Circuit has recognized the claim, but in a non-precedential decision, *Trepka v. Bd. of Educ.*, 28 F. App'x 455, 461 (6th Cir. 2002).

*Chicago Transit Auth.*, 367 F.3d 714, 727 (7th Cir. 2004) (more than three years). There is no magic number; the question is whether "the series of allegations describe continuous conduct rather than isolated incidents." *Milligan-Grimstad*, 877 F.3d at 713. In this case, a gap of eighteen months separated Ladd and Watts's departure and the date in June 2016 when Ford put the Sheriff's Office on notice of disability harassment by Hendricks. In saying this, we must acknowledge that, according to Ford's testimony, she was subjected to a continuous pattern of harassment, first by Ladd and Watts and then by Hendricks. But from the perspective of the employer that she seeks to hold liable, there was a significant gap. Ford complained about conflict with Hendricks, but it was not until June 2016, eighteen months after Hendricks joined the Visitation Office, that Ford complained to her supervisors that Hendricks was harassing her *because of her disability*. That fact distinguishes this case from *Bright* and *Isaacs*, where the sexual harassment and the plaintiffs' complaints about sexual harassment were essentially continuous.[7]

On the other hand, our cases make clear that "the harassers' identities, whether they acted in concert or isolation, and whether they harassed in distinct or similar fashions" do not bear on the inquiry. *Milligan-Grimstad*, 877 F.3d at 712. *Isaacs* and *Bright* emphasized this point. Both cases involved alleged harassment by multiple groups of the plaintiffs' male co-workers. We explained that which co-workers were involved and how they harassed did not matter because the employer, not the co-workers, is the party that is legally obliged

---

[7] Ford also alleges a possible incident in September 2015, but the Sheriff's Office did not have notice of it, as we discuss below regarding the merits of the summary judgment order.

to comply with Title VII. *Isaacs*, 485 F.3d at 386; *Bright*, 510 F.3d at 769–70.

A change in managers can affect whether incidents are related. Unlike the actions of co-workers, the actions of supervisors impart vicarious liability to the employer for discriminatory harassment. See *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 765 (1998). As a result, we observed in *Isaacs*: "An employee moved from one plant to another, where a different set of managers made decisions about working conditions, might well experience different hostile environments for the purpose of *Morgan*." 485 F.3d at 386; see *Morgan*, 536 U.S. at 120 (citing "perpetrat[ion] by the same managers" as a reason to find a single employment practice). That said, "routine personnel actions" not taken to alleviate the harassment are less significant. See *Vickers v. Powell*, 493 F.3d 186, 199 (D.C. Cir. 2007). Here, Ford's supervisor changed in between the two periods of harassment. Lieutenant Walterman left his post not long after Ladd and Watts's departures. Lieutenant Nesbitt and later Lieutenant Shanklin had direct control over the Sheriff's Office's response to possible disability harassment of Ford from March 2015 forward, during the alleged harassment by Hendricks.

Finally, as noted, "certain intervening action by the employer" can interrupt a hostile work environment claim. *Morgan*, 536 U.S. at 118. Although the Supreme Court did not say which intervening actions qualify, we have held that "prompt and appropriate corrective action reasonably likely to prevent the harassment from recurring" defeats employer liability for co-worker harassment. *Porter v. Erie Foods Int'l, Inc.*, 576 F.3d 629, 636 (7th Cir. 2009). The same standard can determine whether an action suffices to sever a hostile work

environment claim. *Bright* held that a two-week suspension of the harassers, with no evident effect on their sexist behavior, did not alter the duration of the unlawful employment practice. 510 F.3d at 769–70. A case from the Fifth Circuit, by comparison, found that a transfer made to separate the plaintiff and the harasser did sever the hostile work environment claim. See *Stewart v. Mississippi Transp. Comm'n*, 586 F.3d 321, 329 (5th Cir. 2009).

We agree that removing alleged harassers permanently, as the Sheriff's Office did with Ladd and Watts, can bring an end to the unlawful employment practice at issue. Cf. *Saxton v. Am. Tel. & Tel. Co.*, 10 F.3d 526, 535 (7th Cir. 1993) (finding that transfer of the harasser was "a sufficient safeguard against any recurrence of the harassment" to defeat employer liability). As explained above, however, an incidental rotation of co-workers not calculated to address the harassment does not necessarily affect a hostile work environment claim against the employer. See *Isaacs*, 485 F.3d at 385–86. Only a transfer that amounts to "intervening action by the employer" can close out a distinct unlawful employment practice. *Morgan*, 536 U.S. at 118.

We are not suggesting there is a hard and fast rule to apply here. At least for now, we are applying a standard implied in *Morgan* to determine when different episodes of unlawful harassment, whether based on disability, race, sex, or any other protected category, may be treated separately by a district court. The following factors—all present in Ford's case— support a finding that alleged incidents of harassment have "no relation" to each other under *Morgan*: a substantial passage of time without incident known to the employer, a change in the employee's supervisors, and an intervening

remedial action by the employer. The district court here incorrectly divided the harassment claim based on the identities of the harassers rather than the "intervening action" of the Sheriff's Office, but the court reached the right result. We affirm based on the eighteen-month gap, the departure of Lieutenant Walterman, and the transfer of Ladd and Watts calculated to end their alleged harassment. On the facts of Ford's case, the court did not err in independently evaluating two distinct claims for a hostile work environment.

## III. *Ford's Substantive Arguments for Reversal*

Turning to the merits of Ford's claims, she challenges on appeal the partial grant of summary judgment on some claims. She also argues that several evidentiary rulings and a jury instruction require a new trial on the claims that were tried. We consider these arguments in turn.

### A. *Summary Judgment Ruling*

Ford appeals the grant of summary judgment on: (1) her claim that the demotion to visitation clerk was not a reasonable accommodation, but in fact was discriminatory and retaliatory; (2) the part of her hostile work environment claim based on Hendricks's actions from January 2015 forward, as discussed above; and (3) her discrimination and retaliation claims stemming from the four decisions not to promote her after March 2016. We review *de novo* a district court's grant of summary judgment. *Brown*, 855 F.3d at 820.

#### 1. *Demotion to Visitation Clerk*

Ford argues that, although the Sheriff's Office found a new position for her after the accident, the visitation clerk job was not a reasonable accommodation because better vacancies were available at the time. The ADA required the Sheriff's

Office to canvass available positions and, if a vacant job existed that Ford was qualified to perform with or without reasonable accommodations, to offer it to her. See *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 694–95 (7th Cir. 1998). Ford's simple statement that she "want[ed] to work" was enough to trigger this duty to accommodate. *Id.* at 694. The Sheriff's Office asserts that it satisfied its duty by reassigning Ford to the visitation clerk position, which it admits was a demotion from her prior post as a warrants deputy.

A demotion can be a reasonable accommodation when the employer cannot accommodate the disabled employee in her current or prior jobs or an equivalent position. See *Gile v. United Airlines, Inc.*, 213 F.3d 365, 374 (7th Cir. 2000); *Hendricks-Robinson*, 154 F.3d at 694–95. But if Ford could show that she qualified for a vacant position that more closely matched her previous job, the ADA would have obliged the Sheriff's Office to offer it to her. The EEOC's interpretive guidance on this point states: "An employer may reassign an individual to a lower graded position if … there are no *vacant equivalent* positions for which the individual is qualified *with or without* reasonable accommodation." 29 C.F.R. Pt. 1630, App. § 1630.2(*o*) (emphasis added). The Tenth Circuit has examined this issue, along with the EEOC's guidance, and concluded that an employer "should first consider lateral moves to positions that are regarded as equivalent." *Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1177 (10th Cir. 1999). We agree.[8]

---

[8] Although EEOC interpretive guidance does not receive deference under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), it does "reflect a body of experience and informed judgment to which courts and litigants may properly resort for guidance" and is therefore "entitled to a measure of respect." *Richardson v. Chicago Transit*

To take advantage of this principle, however, Ford needed to come forward with evidence that a more equivalent position for which she was qualified was vacant at the relevant time. See *Dunderdale v. United Airlines, Inc.*, 807 F.3d 849, 856 (7th Cir. 2015). Ford's complaints about terse, unhelpful responses from Grider, the director of human resources, do not control this question. We have repeatedly explained that a problem in the "interactive process" to reach an accommodation is not itself actionable; the ADA looks to ends, not means. See, e.g., *Bunn v. Khoury Enterprises, Inc.*, 753 F.3d 676, 683 (7th Cir. 2014); *Rehling v. City of Chicago*, 207 F.3d 1009, 1015–16 (7th Cir. 2000). "It is well-established that an employer is obligated to provide a qualified individual with a reasonable accommodation, not the accommodation he would prefer." *Id.* at 1014.

To survive summary judgment, Ford needed to present evidence that some vacant position existed closer to her original job, rendering the visitation clerk demotion unreasonable. She failed to do so. The relevant time period for possible vacancies began in June 2013, when Ford requested accommodation under the ADA. See EEOC, Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans With Disabilities Act (2002), *reprinted in* 2 EEO Compl. Man. (BNA) at 902:151 ("'Vacant' means that the position is available *when the employee asks for reasonable accommodation*, or that the employer knows that it will become available within a reasonable amount of time." (emphasis added)). Until Ford requested accommodation, the Sheriff's Office was

---

*Auth.*, 926 F.3d 881, 889 (7th Cir. 2019), citing *Federal Express Corp. v. Holowecki*, 552 U.S. 389, 399 (2008).

not on notice of the need to consider her for potential reassignment to vacancies that arose.

Ford identified only two possible vacancies. First, she provided some evidence that civilian vacancies opened in the warrants division between February and May 2013. The district court correctly found that any such vacancies fell outside the relevant period. Second, Ford argued that dispatcher positions were available "constantly" but that she was never given an opportunity to train for one. Yet the record also contains uncontradicted evidence that dispatcher positions involved duties that Ford could not perform even with accommodation. In short, Ford failed to introduce evidence suggesting that the visitation clerk reassignment was not a reasonable accommodation.

Ford also argues that the demotion to visitation clerk was an adverse action that can support additional claims for disability discrimination and retaliation. We do not see how the reassignment could be simultaneously a reasonable accommodation *and* an adverse employment action. Where both sides agreed that Ford could no longer serve as a sheriff's deputy, reasonable accommodation standards provide the better framework. Cf. 42 U.S.C. § 12111(9)(B) (defining "reasonable accommodation" to include "reassignment to a vacant position"). We have trouble imagining how a demotion that qualifies as a reasonable accommodation *required* by the ADA can, at the same time, constitute disability discrimination or retaliation *prohibited* by the ADA. The district court properly granted summary judgment on the claims arising from Ford's transfer to the Visitation Office.

2. *Hostile Work Environment After January 2015*

As explained, the district court properly considered two separate periods of alleged hostile work environment based on disability harassment. The district court correctly awarded summary judgment for the later period from January 2015 to July 2016, involving Hendricks. The same standard governs hostile work environment claims under the ADA as under other employment discrimination laws.[9] To survive summary judgment, plaintiffs must present evidence that: "(1) they were subject to unwelcome harassment; (2) the harassment was based on their [disability]; (3) the harassment was so severe or pervasive as to alter the conditions of employment and create a hostile or abusive working environment; and (4) there is a basis for employer liability." *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 900 (7th Cir. 2018) (racially hostile environment claim). On the final prong, employers are strictly liable for harassment committed by supervisors, but liable for harassment by co-workers only if the employer was "negligent either in discovering or remedying the harassment." *Nischan v. Stratosphere Quality, LLC*, 865 F.3d 922, 930 (7th Cir. 2017).[10]

The district court correctly held that Ford failed to show a genuine issue of material fact under this standard. She offered

---

[9] See *Mannie v. Potter*, 394 F.3d at 982; *Fox v. General Motors*, 247 F.3d at 177; see also 1 Janet Arterton & Gary Phelan, Disability Discrimination in the Workplace § 2:18 n.8 (2019) (surveying circuits).

[10] An employer can still avoid strict liability for a supervisor's harassment if it did not involve a "tangible employment action" and the employer can prove an affirmative defense. See *Jackson v. County of Racine*, 474 F.3d 493, 501 (7th Cir. 2007), citing *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 765 (1998).

evidence of three incidents involving Hendricks where the employer arguably should have known they related to Ford's disability. In September 2015, Hendricks told Ford that she should be required to prove her disability in order to avoid shifts in the Main Control Office, and Lieutenant Shanklin overheard this comment. The second comment was from Major Crear, who questioned during the January 2016 passport incident whether Ford was really "in as much pain as [she] was claiming to be." Finally, in June 2016, Hendricks insinuated that Ford was faking her disability to avoid the difficult work in the Main Control Office. Ford reported this final comment in a written complaint to Shanklin. This was her fifth written complaint regarding Hendricks, but the first to mention Ford's disability.

As a matter of law, the first two incidents simply do not show conduct "sufficiently severe or pervasive to have altered the conditions of her employment such that it created an abusive working environment." *Passananti v. Cook Cty.*, 689 F.3d 655, 667 (7th Cir. 2012). At worst they amount to "[o]ffhand comments, isolated incidents, and simple teasing." *Id.* Regarding the employer liability prong, the overheard remark in September 2015 was not "sufficiently obvious" harassment to give the Sheriff's Office constructive notice of disability harassment. *Hrobowski v. Worthington Steel Co.*, 358 F.3d 473, 478 (7th Cir. 2004). Not until the written complaint in June 2016 was the Sheriff's Office on notice that Ford believed Hendricks was harassing her based on her disability. The Office then took prompt action, transferring Hendricks out of the Visitation Office the next month. This transfer defeats any claim that the Office was negligent in addressing any known disability harassment by Hendricks. See *Muhammad v. Caterpillar, Inc.*, 767 F.3d 694, 698 (7th Cir. 2014) ("Title VII requires

only that employers take action reasonably calculated to stop unlawful harassment … .”); *Saxton*, 10 F.3d at 535–36 (holding that transfer of the harasser is such an action). The district court did not err by granting summary judgment on the claim that the Sheriff's Office should be held liable for a hostile work environment created by Hendricks on the basis of disability.

### 3. *Failures to Promote*

The final category of claims resolved at summary judgment arose from four applications for promotion between March 2016 and February 2017. The district court assumed that the four positions would have been promotions for Ford, and we assume so as well.[11]

---

[11] The Sheriff's Office argues that Ford exhausted her administrative remedies only as to the first of the four denied promotions, which was the only one that preceded her second EEOC charge, filed March 15, 2016. The three later denials occurred after she filed that second EEOC charge. We disagree with this defense. Ford alleged the three later denials were in part retaliation against her earlier ADA-protected activity. We have long held that an employment-discrimination plaintiff can include in her court complaint allegations of discrimination that are “like or reasonably related to” the allegations in her EEOC charge, which typically means the new claims must describe the same conduct and implicate the same individuals as those in the charge. E.g., *Cheek v. Western and Southern Life Ins. Co.*, 31 F.3d 497, 501 (7th Cir. 1994). More specifically, we have long held that a plaintiff need not file a new charge alleging post-charge retaliation by the employer. E.g., *Malhotra v. Cotter & Co.*, 885 F.2d 1305, 1312 (7th Cir. 1989) (“we join the other circuits that have spoken to the question in adopting the rule that a separate administrative charge is not prerequisite to a suit complaining about retaliation for filing the first charge”), superseded by statute on other grounds; *McKenzie v. Illinois Dep't of Transportation*, 92 F.3d 473, 482–83 (7th Cir. 1996) (collecting cases); *Luevano v. Wal-Mart Stores, Inc.*, 722 F.3d 1014, 1030 (7th Cir. 2013) (“to avoid futile procedural technicalities and endless loops of charge/retaliation/charge/retaliation,

A failure to promote is a discrete act under employment discrimination laws, so each denied promotion can amount to a "separate actionable 'unlawful employment practice.'" *Morgan*, 536 U.S. at 114. One way to prove a claim for a discriminatory failure to promote is for the plaintiff to show: (1) she belongs to a protected class, (2) she applied for and was qualified for the position sought, (3) she was rejected for that position, and (4) the employer granted the promotion to someone outside of the protected group who was not better qualified than the plaintiff. E.g., *Grayson v. City of Chicago*, 317 F.3d 745, 748 (7th Cir. 2003). Ford attempted this approach to proof, but that required her to compare herself to the successful applicant for each job. Only then would the burden of production shift to the Sheriff's Office to give non-discriminatory reasons for the promotion decisions, which Ford could rebut with evidence of pretext. See *id.*; *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973); see generally *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507–08 (1993) (describing the mechanics of burden-shifting in discrimination law).

Nearly all of Ford's purported evidence of discrimination is irrelevant under these standards. Ford argues that the Sheriff's Office treated Ladd, Watts, Hendricks, and Johnson better

---

etc., … a plaintiff who alleges retaliation for having filed a charge with the EEOC need not file a second EEOC charge to sue for that retaliation"); see also *Haugerud v. Amery School Dist.*, 259 F.3d 678, 690 (7th Cir. 2001) (considering merits of claims stemming from months after EEOC charge where "one would reasonably expect [the incidents] to be discovered during the course of an EEOC investigation into the allegations in the charge"). In this case, an investigation of the first denied promotion could reasonably be expected to have delved into the later denials that occurred in the next few months. There was no need for Ford to have filed a third EEOC charge alleging the later denials were also retaliatory.

than it treated her in various ways. But none of these individuals competed for the specific promotions that Ford sought. Ford also discusses at length deficiencies she identified in the Office's ADA policies. An employer's "general policy and practice with respect to minority employment" can be relevant evidence of pretext or discrimination, see *McDonnell Douglas*, 411 U.S. at 804–05; *McCluney v. Joseph Schlitz Brewing Co.*, 728 F.2d 924, 928 (7th Cir. 1984), and the same is true for disability discrimination. Yet such evidence must undercut the specific justifications given by the employer. General allegations of an "ongoing history of discrimination" are not enough to impugn a particular employment decision. *Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 739 (7th Cir. 2006).

Ford identified four specific rejections. In March 2016, she applied to become a clerk for the sex- and violent-offender registry. Grider told Ford she was not selected because the division commander wanted someone without disciplinary history within the past year, which meant that Ford's August 2015 reprimand disqualified her. In the summer of 2016, Ford applied for an "HR Generalist" position. She received an interview but was denied the position. In October 2016, she applied for an intelligence analyst position; she was denied an interview because of her "attendance history and/or discipline history." In February 2017, Ford interviewed for two open analyst positions but was not hired.

The district court correctly found no material disputes of fact as to any of the promotion decisions. The record discloses little about any of the people who were named to the jobs. Ford identifies no specific person who filled the March 2016 opening. Ford identified the people chosen for the three later jobs but presented little evidence about them beyond their

names. All that we know comes from a single page of Ford's declaration in opposition to summary judgment, which contains conclusory statements regarding the other applicants' lack of merit. We agree with the district court that Ford did not present enough evidence about the jobs or how she compared to the other candidates to support an inference of discrimination.

The Sheriff's Office also presented unrebutted, non-discriminatory reasons for each decision. Ford's disciplinary history precluded her consideration for the March 2016 and October 2016 positions, per Sheriff's Office policy. Ford argues that this policy did not disqualify her, but she provided no evidence to substantiate the point. Cf. *Hill v. Potter*, 625 F.3d 998, 1004 (7th Cir. 2010) (explaining that a plaintiff "must do more than simply deny that the [neutral] Policy exists"). The HR Generalist position went to a candidate with superior Microsoft Office and Excel skills, a justification that Ford has not contested. Finally, the February 2017 analyst position simply went to a better qualified candidate, again according to unrebutted testimony from the Sheriff's Office. None of the alleged pretext evidence that Ford identified bore upon these specific hiring decisions.

Ford argues that the promotion denials were also unlawful retaliation, which as explained above is a separate theory for relief. Yet Ford has not shown, in the district court or on appeal, how her retaliation claims stand apart from her discrimination claims. She relies on the same evidence to support both. The district court treated the retaliation and discrimination claims as co-extensive. It did not err by granting summary judgment on each of the promotion claims.

B.  *Alleged Errors at Trial*

Ford argues that we must remand for a new trial on her remaining claims because of evidentiary rulings by the district judge and an unnecessary jury instruction. Neither argument is persuasive.

1.  *Excluded Background Evidence*

Ford argues that the district court denied her a fair trial on the two claims that went to trial—the alleged hostile environment created by Ladd and Watts, and the scheduling accommodation she sought—by refusing to admit more background evidence about her disability-related disputes with the Sheriff's Office. We review evidentiary rulings for an abuse of discretion. E.g., *Thompson v. City of Chicago*, 722 F.3d 963, 971 (7th Cir. 2013). Even if we found such an abuse of discretion, we would order a new trial only if there were a significant chance that the ruling affected the outcome of the trial. E.g., *Smith v. Hunt*, 707 F.3d 803, 808 (7th Cir. 2013).

Ford identifies four categories of excluded evidence that she argues amount to reversible error: (1) the "three choices" meeting in June 2013; (2) the details of the interactive process to identify an accommodation for her disability between June and September 2013; (3) the Sheriff's Office's "general animus" against the ADA during the interactive process; and (4) the Office's broken promise to train Ford's supervisors.

The first three categories underlie Ford's claim that the visitation clerk job was not a reasonable accommodation. To the extent that Ford is just reiterating her objections to the grant of summary judgment on that claim, we have already addressed her objections. Ford also argues, however, that these categories of evidence would have provided the jury context

or background for her disability harassment and scheduling accommodation claims that did go to trial.

The Sheriff's Office replies that Ford waived this argument when she herself moved *in limine* to prohibit the Office from "entering evidence relating to claims … on which the Court granted summary judgment." But the court's order on the motions *in limine* was "not a final ruling regarding the admissibility of the evidence at issue" and, by its own terms, left parties free to "request a sidebar conference during the appropriate point in the trial." Ford did not waive the issue; she did raise her objections at trial.

Ford has not shown an abuse of discretion, however. The district court evenhandedly enforced a rule that only conduct after October 2013, when Ford began working with Ladd and Watts in the Visitation Office, was relevant to the harassment claim at trial. That was a reasonable way to keep the trial focused on the disputes the jury would actually need to decide. We doubt that evidence from before the alleged disability harassment began could fairly sway the outcome of a hostile work environment claim. In addition, Ford herself took advantage of the district court's time limit. Before trial, she objected to exhibits concerning her disciplinary history and fitness for duty from outside this time period, and the court sustained those objections. Ford referred at trial to the "relevant time period" and asked for evidence of earlier events to be excluded. The first three categories of evidence that Ford argues should have been admitted reflect the application of this neutral time limit to her, and we find no abuse of discretion.[12]

---

[12] We do not find persuasive Ford's alternative argument that the Sheriff's Office opened the door to such evidence. The district judge still

Ford's fourth category fares no better for a more basic reason. Ford states that the district court excluded evidence that the Sheriff's Office "failed to abide by its own agreement to provide 'training to [Ford's] supervisors regarding [Ford's] condition.'" But the district court *admitted* the evidence on this subject. During Ford's direct examination of Lieutenant Walterman, the district court initially paused this line of questioning, but later allowed it to go forward—over the objection of the Sheriff's Office. Another of Ford's supervisors also testified that he lacked much training on the ADA.

This case illustrates the challenges of managing a trial after a partial grant of summary judgment. In a typical example from employment discrimination law, a trial on a retaliation claim might follow a grant of summary judgment on a distinct claim for discrimination based on an earlier event. The court must allow jurors to learn enough about the alleged discrimination so that they can understand the retaliation claim. At the same time, the court must keep the jurors focused on the claim actually before them, avoiding a full trial-within-a-trial on the underlying discrimination claim. For this reason, we allow district judges to exclude extraneous evidence relevant only to the discrimination claim. See, e.g., *Abuelyaman v. Illinois State Univ.*, 667 F.3d 800, 810 n.5 (7th Cir. 2011). More generally, we afford trial judges "wide latitude" in making these

---

had a duty to keep out irrelevant evidence, notwithstanding passing references to other accommodations Ford was receiving. See *Houlihan v. City of Chicago*, 871 F.3d 540, 553 (7th Cir. 2017) ("the Rules of Evidence do not simply evaporate when one party opens the door on an issue"). Even where one party has "opened the door" to evidence that would otherwise stay out, whether and to what degree to allow rebuttal are matters committed to the trial judge's discretion, which may consider the need to keep the trial focused on relevant evidence and issues.

sorts of relevance determinations. *Hasham v. California State Bd. of Equalization*, 200 F.3d 1035, 1050 (7th Cir. 2000). The district court acted well within that discretion here.

### 2. *Jury Instruction No. 20*

Ford's final argument relates to Jury Instruction 20, which stated in full: "The ADA does not entitle a disabled employee to the accommodation of her choice. Rather, the law entitles her to a reasonable accommodation in view of her disability and her employer's needs." Ford does not contend that this instruction provided an inaccurate statement of law, nor could she. See *Rehling v. City of Chicago*, 207 F.3d 1009, 1014 (7th Cir. 2000); see also Seventh Circuit Pattern Civil Jury Instructions 4.07(a) (2017 rev.). Ford instead argues that the presence of Jury Instruction 20 implied that she was given a choice among different accommodations, when in fact the Sheriff's Office denied her request for a schedule accommodation, full stop.

Ford argues, in other words, that Jury Instruction 20 was extraneous and therefore prejudicial. It is true that "a jury should not be instructed on a defense for which there is so little evidentiary support that no rational jury could accept the defense." *Eastern Trading Co. v. Refco, Inc.*, 229 F.3d 617, 621 (7th Cir. 2000). When a losing party complains of such surplusage in the jury instructions, "reversal requires a showing that the jury *probably* was confused." *Id.* at 622. We have said that "[t]he requirement of prejudice is critical" in such cases because we must afford district judges discretion to submit even marginal issues to the jury. *Burzlaff v. Thoroughbred Motorsports, Inc.*, 758 F.3d 841, 849 (7th Cir. 2014).

Ford cannot show prejudice here. Her concerns bear on the unreasonable hardship prong, under which the Sheriff's Office could refuse to provide an otherwise reasonable accommodation. The jury's special verdict found that Ford had failed to show the schedule change was a reasonable accommodation in the first place. Testimony that the rotating schedule was actually more predictable and effective cross-examination of Ford's doctor provided evidence supporting the jury's verdict. The jury thus did not reach the undue hardship issue, so we are confident that Instruction 20's correct statement of the law did not unfairly affect the outcome of the trial.

*Conclusion*

The district court properly granted partial summary judgment as to some of plaintiff's claims and then exercised its discretion fairly to manage the trial on the remaining claims. The judgment of the district court is

AFFIRMED.