In the

# United States Court of Appeals

## For the Seventh Circuit

No. 14-3309

MARK SWANSON,

*Plaintiff-Appellant,*

*v.*

VILLAGE OF FLOSSMOOR,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:11-cv-4421 — **Joan B. Gottschall**, *Judge.*

ARGUED JUNE 5, 2015 — DECIDED JULY 24, 2015

Before WOOD, *Chief Judge*, and FLAUM and
EASTERBROOK, *Circuit Judges.*

FLAUM, *Circuit Judge*. Mark Swanson resigned from
the Village of Flossmoor's police department after suffering two strokes, six weeks apart, the second of which left him unable to perform his job as a detective. Swanson claims that the Village failed to reasonably accommodate him—in violation of the Americans with Disabilities Act—upon his return to work from his first stroke by not

permitting him to work exclusively at a desk. He also charges the Village with offending Title VII of the Civil Rights Act of 1964 by discriminating against him on the basis of his race and national origin. He cites various instances in which Village employees made racially offensive comments to him during the course of his employment. He also complains that the Village excluded him from criminal investigations after his first stroke and then contemplated the possibility of moving him out of the investigations division entirely after his second stroke.

The district court granted summary judgment in favor of the Village. The court deemed Swanson's Title VII claims time-barred because Swanson failed to lodge a formal charge with the U.S. Equal Employment Opportunity Commission within the requisite 300-day period following the alleged discrimination. And the court branded Swanson's ADA claim deficient in view of his doctor's recommendation that Swanson work "part-time" following his first stroke. We affirm.

## I. Background

Mark Swanson was hired as a patrol officer by the police department of the Village of Flossmoor, Illinois in January 2000. On November 25, 2006, he was promoted to detective in the criminal investigations unit, where he worked under the supervision of Sergeant James Hundley and Deputy Police Chief Michael Pulec until his career was tragically cut short by two strokes that forced him to resign.

When Swanson suffered his first stroke on July 31, 2009, he took a leave of absence pursuant to the Family

and Medical Leave Act until August 19, 2009. Swanson returned to work with a note from his doctor, which read: "part-time work suggested until patient seen by Neurologist on 9-18-09." To heed his doctor's advice, Swanson began using two days of his accrued medical leave each week, enabling him to receive a full paycheck while only working three-day weeks.

According to Swanson, upon his return to work, he was excluded from several investigations in which he should have been involved. He also says that at some point during the month of September he began experiencing headaches and lightheadedness, which prompted him to ask Pulec if he could be placed on "light duty" (or desk duty, as Swanson's counsel defined the term at oral argument). Swanson claims that Pulec told him that the police department had no light duty policy and denied the request. Swanson therefore continued to use his accrued medical leave to work a reduced schedule—a routine that satisfied his doctor's recommendation until September 30, when Swanson experienced another stroke.

Swanson's second stroke rendered him unable to work as a detective or patrol officer, and so Swanson's doctor excused him from work until further notice. By November 17, Swanson's status had not changed. He submitted paperwork certifying as much and requesting FMLA leave retroactively to September 30. The Village approved Swanson's request, and he continued to use his paid medical leave to cover his absence.

Following Swanson's second stroke, then-Police Chief William Miller was his sole point of contact at the department. On December 10, Miller wrote to Swanson to

inform him that his FMLA leave had expired and that his paid medical leave would expire on December 18. The letter reminded Swanson that he could request an unpaid leave of absence from the Village. It also informed him that he would "most likely" be reassigned from the investigations division to the patrol division upon his return to work.

On December 16, Swanson's doctor released him back to work without restrictions. Before actually returning to his job, however, Swanson suffered another medical episode, which prompted his doctor to rescind his prior release and prohibit Swanson from resuming work. After further consultation with his physician, Swanson resigned five days later. His December 21 resignation letter expressed his disappointment that he was "simply physically unable to return to [his] duties with the department." It further stated that "due to residual physical and neurological issues related to [his] July, 2009 stroke [he was] unable to resume [his] duties as a Police Officer/Detective with the department." The letter also requested a disability pension from the Village, for which Swanson formally applied the next day. Around this time, Swanson asked to remain on an unpaid leave of absence until February 6, 2010, which would afford him continued access to the Village's health insurance plan, despite his planned resignation. The Village granted Swanson's leave-of-absence request.

On February 23, 2011, the Village Pension Board held a hearing to review Swanson's pension application. Swanson testified that he could no longer perform his duties as a police officer, and the Village agreed—

awarding him a disability pension of 50% of his former salary retroactive to December 21, 2009. Swanson's application also sought a line-of-duty pension—which would have entitled him to 60%, rather than 50%, of his salary—but the Pension Board denied that request, having determined that the evidence presented did not establish that Swanson's disability was duty-related. Swanson sought review of that decision by filing a Complaint for Administrative Review in the Circuit Court of Cook County. The court affirmed the Pension Board's determination on January 18, 2013. Swanson appealed the court's ruling, but on March 3, 2014 that decision, too, was affirmed. To date, Swanson remains medically unable to work as a Village police officer.

Highly relevant to this appeal, Swanson filed a discrimination charge with the Equal Employment Opportunity Commission on September 14, 2010. The entirety of his complaint read:

> I began my employment with [the Flossmoor Police Department] in January 2000. My most recent position was Detective. During my employment, I was subjected to harassment, including, but not limited to, comments based on my national origin. Respondent is aware of my disability. I requested a reasonable accommodation which was not provided. Subsequently, I was demoted.

> I believe that I have been discriminated against because of my national origin, Puerto Rican, in violation of Title VII of the Civil Rights Act of 1964, as amended.

I believe that I have been discriminated against because of my disability, and retaliated against for engaging in protected activity, in violation of the Americans with Disabilities Act of 1990, as amended.

On June 29, 2011, Swanson brought this four-count lawsuit against the Village. Counts I, II, and III allege violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. Count IV alleges a violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq*.

Counts I and III allege race and national origin discrimination, respectively, contending that Village employees discriminated against Swanson by making various derogatory comments about his Puerto Rican descent during the course of his employment. Swanson's appellate brief highlights a few examples. For instance, Swanson says that during a February 2000 traffic stop, his supervisor Sergeant Hundley asked another officer not to call Swanson a "Mexican" because "Puerto Ricans don't like that." Swanson also complains that, in 2007, Sergeant Hundley "would have Detective Swanson try to speak Spanish [to Hispanic drivers that they pulled over] even though he knew that Detective Swanson did not speak Spanish." Once, Hundley apparently commented: "Oh, you don't speak Spanish, what kind of Mexican are you?" On other occasions, when a Hispanic person was in lockup, unidentified "Village employees" would remark to Swanson: "some of your people are in lockup." Swanson says that these types of comments persisted until his last day of employment with the Village police department. Swanson also believes that, as a general matter, white of-

ficers were treated better than non-white officers. He alleges, for instance, that a black colleague was once reprimanded for leaving his taser on his desk, while a white colleague went without admonishment despite leaving a loaded rifle on the back of his office door after every shift.[1]

Count II alleges retaliatory discrimination, contending that "after [his] stroke, [he] was excluded from investigations; demoted to patrol officer; and had his position replaced." Swanson, however, abandons this claim on appeal.

Count IV, the ADA charge, alleges that the Village failed to make reasonable accommodations for him when he returned to work, following his first stroke, on August 19, 2009. Consequently, Swanson says, "he has suffered and will continue to suffer damage including loss of wages and benefits … pain and suffering, and extreme and severe mental anguish and emotional distress."

The Village filed a motion for summary judgment, which the district court granted in full. The court deemed Counts I and III time-barred, because Title VII discrimination claims are only actionable if first complained about to the EEOC within 300 days of the alleged unlaw-

---

[1] Curiously, Swanson does not attempt to make out a Title VII claim premised on an allegation that he experienced a hostile work environment. His brief in opposition to the Village's summary judgment motion expressly disavowed such a claim, making clear that "Swanson has not alleged a hostile work environment. He has alleged a disparate treatment claim. Thus, Flossmoor's argument [that Swanson's Title VII claim should be dismissed for failure to prove the existence of a hostile work environment] is meritless."

ful employment practice. Yet when Swanson filed his dis-crimination charge with the EEOC on September 14, 2010, more than 300 days had passed since his last day of active employment with the Village, September 30, 2009. The district court rejected the notion that Swanson's peri-odic contact with Chief Miller during his leave of absence somehow delayed the start of the 300-day limitations pe-riod.

The district court dismissed Count II, Swanson's since-abandoned claim of retaliatory discrimination, for failure to identify a protected activity that could serve as the basis of such a claim.

Regarding Count IV, Swanson's ADA claim, the dis-trict court concluded that Swanson simply did not demonstrate that the Village failed to reasonably accom-modate his disability. To the contrary, the Village permit-ted him to use two days of medical leave each week to work the part-time schedule suggested by his doctor.

On appeal, Swanson contests the district court's summary judgment ruling with respect to Counts I, III, and IV.

## II. Discussion

We review the district court's grant of summary judgment de novo, reading the record in the light most favorable to Swanson and construing all reasonable in-ferences from the evidence in his favor. *Nacify v. Ill. Dep't of Human Servs.*, 697 F.3d 504, 509 (7th Cir. 2012).

### A. Swanson's Title VII Claims

Title VII prohibits discrimination on the basis of race and national origin. *Henry v. Jones*, 507 F.3d 558, 564 (7th Cir. 2007) (citing 42 U.S.C. § 2000e-2(a)(1)). To prove a Title VII violation, a plaintiff can avail himself of either the direct or indirect method of proof. *Coffman v. Indianapolis Fire Dep't*, 578 F.3d 559, 563 (7th Cir. 2009). Proceeding under the direct method of proof requires a plaintiff to put forth direct (or sufficient circumstantial) evidence indicating that he experienced intentional discrimination. *Id*. Under the indirect method of proof, a plaintiff needs to show that (1) he is a member of a protected class, (2) who met his employer's legitimate job expectations, (3) yet suffered an adverse employment action, (4) that similarly situated employees outside his protected class did not. *See Nacify*, 697 F.3d at 511.

But, to bring a Title VII claim at all—as the district court noted (and as Swanson acknowledges)—a plaintiff must file a complaint with the EEOC within 300 days of experiencing the complained-of discrimination. *Peters v. Renaissance Hotel Operating Co.*, 307 F.3d 535, 550 (7th Cir. 2002). A fatal problem for Swanson, then, is that the specific racially offensive incidents about which he complains all occurred years before he filed his EEOC charge on September 14, 2010. And, even being as generous as possible to Swanson and assuming that similar remarks were made as late as his last day of active employment on September 30, 2009 (and assuming, for argument's sake, that the mere utterance of such a remark can constitute unlawful discrimination under Title VII), Swanson's

September 14, 2010 filing still was too late; July 27, 2010 marked 300 days from his last day on the job.

Swanson tries to skirt the timeliness issue by arguing that his 300-day clock did not commence until December 10, 2009, when Chief Miller told him that he would most likely be reassigned to the patrol division upon his return to the police department. He contends that this was a demotion and thus an adverse employment action. We agree with Swanson that a demotion can constitute an adverse employment action. *See Hicks v. Forest Preserve Dist. of Cook Cnty., Ill.*, 677 F.3d 781, 787 (7th Cir. 2012). However, the Supreme Court has been clear that Swanson cannot sue for otherwise time-barred conduct in this instance. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113–17 (2002). A plaintiff who complains of discrete discriminatory acts (as Swanson purports to do), must report each act to the EEOC in the required timeframe. *Id.* at 114. By contrast, a plaintiff who makes a hostile work environment claim may invoke the continuing violations doctrine and recover for related employer conduct outside the limitations period; the theory is that "[a] hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'" *Id.* at 117. Swanson, however, does not make such a claim. Thus, Swanson's allegations of discrimination during the course of his active employment are time-barred, and he may only pursue his demotion complaint.

To be actionable under Title VII, Swanson must show that his employer's action was discriminatory in nature. Problematic for Swanson, then, is that there is no direct

evidence that he was being reassigned because of his race or national origin. Nor is there a reasonable inference to be drawn from the past derogatory comments that he cites, none of which were made by Chief Miller. Rather, the parties' Statements of Facts establish that Swanson's interactions with Miller were "always professional" and that Miller "never made statements to Swanson that Swanson considered unprofessional or harassing or derogatory." Accordingly, Swanson cannot establish a connection between the alleged racially offensive comments made to him over the years and his potential reassignment to the patrol division in December 2009, such that a discriminatory motive can be imputed to Miller.[2]

---

[2] Swanson's Title VII allegations also encompass a complaint that he was excluded from investigations following his first stroke. This claim fails for the same reason; no reasonable inference can be drawn linking the Village's conduct to the racial animus he seeks to attribute to Village employees who are said to have made offensive remarks about Puerto Ricans during his employ. Swanson also seems to argue that the Village's denial of his request for "light duty" constituted racial discrimination. But here, again, Swanson offers a dearth of evidentiary support. He cites the names of several white officers to whom the Village provided "light duty" in the past. But he provides us only with the type of injury that they suffered—including a shattered fibula, broken ankle, a torn rotator cuff, and pregnancy—none of which resembles Swanson's stroke. Moreover, Swanson provides us no information about the doctor recommendations of his proposed comparators (i.e., whether, unlike Swanson, their doctors recommended that they be confined to a desk). Therefore, without more information, we cannot draw a meaningful comparison and, thus, determine whether these folks are similar enough to permit a reasonable inference of discrimination. *See Coleman v. Donahoe*, 667 F.3d 835, 841 (7th Cir. 2012).

Moreover, because Swanson never returned to work after his second stroke, he never experienced the demotion about which he complains. Therefore, he never actually suffered an adverse employment action at all. No financial consequences flowed from this potential job change either. His disability pension was based on his salary as of his last day of active work (September 30, 2009), so he felt no monetary impact from his possible reassignment to a different division.[3] As we have said, "not everything that makes an employee unhappy will suffice to meet the adverse action requirement. Rather, an employee must show that material harm has resulted from … the challenged actions." *Traylor v. Brown*, 295 F.3d 783, 788–89 (7th Cir. 2002) (alteration in original) (citations and internal quotation marks omitted). Here, Swanson falls far short of demonstrating that he suffered an adverse employment action on account of his membership in a protected class. Therefore, even if his claims were not time-barred, he could not make out a Title VII violation under either the direct or indirect method of proof.

### B. Swanson's ADA Claim

As best we can tell, Swanson premises his ADA claim on the Village's failure to offer him either "light duty"

---

[3] At oral argument, Swanson's counsel at one point contended that the Village did cause him financial loss, suggesting that the accrued medical leave that Swanson used to arrange his part-time schedule would have been paid to him at the time of his resignation, had he not been forced to use it. But, when pressed (in light of the absence of this claim in his briefs), Swanson's lawyer abandoned this contention.

(again, desk duty) or "part-time" work (which we as-sume means "part-day" work since, as mentioned, the Village allowed him to use his medical leave to work a three-day-a-week part-time schedule) in the six-week pe-riod between his return to work after his first stroke (Au-gust 19, 2009) and the date on which he suffered his sec-ond stroke (September 30, 2009). Swanson makes much of the fact that when he requested "light duty" work, Pulec told him (as Swanson recalls it) that the Village "had no such policy." Swanson discredits Pulec's alleged representation by highlighting that, in fact, the Village's Personnel Manual expressly lists "light duty" work as an option that the Village will consider for employees who become temporarily disabled. Swanson also notes that the ADA requires an employer of a disabled employee to engage in an "interactive process"—a "flexible give-and-take with the disabled employee … [to] determine what accommodation would enable the employee to continue working." *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 805 (7th Cir. 2005). He argues that Pulec's refusal to consider (let alone acknowledge) a "light duty" option constituted a failure to engage Swanson in a sufficiently interactive process under the ADA.

There are a few shortcomings with Swanson's line of reasoning. First, the Village Personnel Manual makes clear that the decision to offer an employee "light duty" work is at the discretion of the department in which the disabled employee works. It also expressly states that a request for "light duty" work will only be considered when an employee submits an "acceptable" "physician's report," specifying the employee's limitations so that the department head can assess whether a suitable "light du-

ty" arrangement can be made. Yet, as the Village emphasizes, Swanson's doctor's note did not recommend "light duty"; it suggested that he work "part-time." And Swanson did just that.

Moreover, even if "light duty" would have been Swanson's preferred accommodation, the ADA does not entitle a disabled employee to the accommodation of his choice. Rather, the law entitles him to a *reasonable* accommodation in view of his limitations and his employer's needs. Accordingly, permitting an employee to use paid leave can constitute a reasonable accommodation. *See Vande Zande v. Wis. Dep't of Admin.*, 44 F.3d 538, 544–45 (7th Cir. 1995); *Taylor v. Pepsi-Cola Co.*, 196 F.3d 1106, 1110 (10th Cir. 1999); *Hankins v. The Gap, Inc.*, 84 F.3d 797, 801–02 (6th Cir. 1996); *cf.* 29 C.F.R. pt. 1630 § 1630.2(o)(2) ("Reasonable accommodation may include but is not limited to: … (ii) Job restructuring; part-time or modified work schedules; reassignment to a vacant position; … and other similar accommodations for individuals with disabilities."). And the Village's accommodation (and, frankly, its general treatment of Swanson in the wake of his medical issues) seems quite reasonable here. In addition to permitting him to work a part-time schedule after his first stroke, the Village granted Swanson's requests to extend his leave following his second stroke to ensure that he would remain on the Village's health plan during his medically difficult time. Swanson's briefs leave entirely unclear why in retrospect he deems these accommodations unacceptable.

In his reply brief, Swanson complains that after his second stroke "Chief Miller never wrote about the possi-

bility of light and/or part-time duty work." To the extent Swanson seeks to pin an ADA violation on the Village's failure to reasonably accommodate him after his second stroke, that claim founders. The ADA only requires employers to reasonably accommodate a disabled employee who can "perform the essential functions of the job, with or without a reasonable accommodation." *Basith v. Cook Cnty.*, 241 F.3d 919, 931 (7th Cir. 2001). And Swanson made clear in his resignation letter, in his disability application, and in his deposition testimony that his second stroke rendered him completely unable to resume the responsibilities of a Village police officer.

Accordingly, Swanson's ADA claim has no merit.

### III. Conclusion

For the foregoing reasons, we AFFIRM the district court's grant of summary judgment in favor of the Village.