In the

# United States Court of Appeals

## for the Seventh Circuit

No. 24-2514

DORED SHIBA,

*Plaintiff-Appellant,*

*v.*

MARKWAYNE MULLIN,[*]
Secretary of Homeland Security,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 18-cv-00914 — **Martha M. Pacold**, *Judge.*

ARGUED APRIL 1, 2025 — DECIDED MAY 5, 2026

Before SYKES, SCUDDER, and KIRSCH, *Circuit Judges*.

SYKES, *Circuit Judge*. Dored Shiba suffered a fall at work two months after starting a new job as an immigration officer at the United States Citizenship and Immigration Services ("USCIS"), an agency within the Department of Homeland

---

[*] We have substituted Markwayne Mullin, the current Secretary of Homeland Security. *See* FED. R. APP. P. 43(c)(2).

Security. He took medical leave, was paid workers' compensation benefits, and remained off work for more than three years. When it became clear that he was incapable of returning to work, the agency terminated his employment.

Shiba contested that decision before the Merit Systems Protection Board, which ordered the USCIS to reinstate him. His attempted return to work was not successful. His symptoms immediately worsened, and he again took medical leave. When he applied to restart his workers' compensation payments, he told the Department of Labor that he was unable to work because the residual infirmities from his original injury had never improved.

While Shiba was still on leave, the Office of Inspector General opened an inquiry into his freelance activities representing refugees before the United Nations Refugee Agency. After a lengthy investigation, the Inspector General determined that he had improperly leveraged his federal position on behalf of Iraqi refugees. The USCIS again fired him.

Shiba sued the Secretary of Homeland Security challenging his termination and alleging various forms of disability discrimination in violation of the Rehabilitation Act. He accused the agency of failing to accommodate his injury, subjecting him to a hostile work environment, and retaliating against him. The district court entered summary judgment for the Secretary on all claims.

Narrowing his focus on appeal, Shiba presses only his accommodation and hostile-workplace claims. As the district judge correctly held, however, these claims are largely unexhausted because Shiba did not timely pursue his administrative remedies. The claims also fail on the merits. We affirm.

## I. Background

Shiba's tenure as a federal employee began in 1998 when he was hired as a legal assistant at the Social Security Administration. In late 2002 he slipped and fell in the bathroom at work, hitting his head on a sink. Shiba resigned from his position and applied for Social Security disability benefits. He also sought and was approved for disability retirement, which entitled him to a separate annuity from the Office of Personnel Management.

Shiba reentered the federal work force about four and a half years later. In April 2007 he started a new job as an immigration information officer in the Chicago field office of the USCIS. Because he continued to receive his disability annuity, he was classified in the USCIS employment system as a "reemployed annuitant."

In June 2007, just two months after starting his new job, Shiba slipped and injured his head and back in another bathroom fall. (The details of the incident are disputed but unimportant to this appeal.) Shiba took medical leave and filed a claim for workers' compensation benefits. The Department of Labor concluded that his injuries left him "incapable of suitable employment" and approved his claim for benefits.

Shiba's leave of absence continued for the next three years. Because his injuries were still unresolved and his return to work was not foreseeable, the USCIS decided to remove him from his position. The agency deemed him unavailable for duty and terminated his employment effective June 9, 2010.

Shiba challenged that decision before the Merit Systems Protection Board, an administrative body that adjudicates the appeals of federal personnel actions. *See* 5 U.S.C. §§ 7513,

7701. At a hearing before an administrative judge, Shiba presented new opinions from two of his physicians, Dr. Ronald Michael and Dr. Yvonne Curran, who cleared him to return to work with restrictions. Based on the new medical opinions, the administrative judge ordered the agency to return Shiba to his position. Still, the judge noted in her order that Shiba's submissions prior to the hearing had "repeatedly stated" that he was unable to work.

Shiba was reinstated effective November 21, 2010. About two months earlier, Dr. Curran had submitted a work-capacity evaluation noting certain sitting and walking limitations and recommending that Shiba take a few minutes every hour to stretch at his desk. Hewing to the doctor's recommendations, the USCIS granted two accommodations: the first permitted Shiba to take hourly five-minute stretch breaks, and the second restricted his walking to the area between his cubicle and the first-floor customer-service window. Any tasks that necessitated walking to other floors would be handled by his supervisor.

Shiba's return to work went poorly from the start. He took medical leave on November 23—only his second day back in the office and the first of many days of medical leave over the next seven weeks. Indeed, between November 22, 2010, and January 11, 2011, Shiba took 17 days of leave, either full or partial. He complained of recurrent migraines while working at his computer; his headaches were sometimes accompanied by nausea and vomiting. Melinda Leach, one of his supervisors, responded with concern and suggested that he step away from his computer. Although Leach permitted him to take breaks, Shiba claims that Martha Medina, another supervisor, told him that he could not, saying that she expected him

to work eight hours a day without complaining about head-aches or back pain. As a result, Shiba says, he started limiting his breaks and "sneaking around" to avoid Medina. He also contacted a union representative who informed him that he could file a complaint with the Equal Employment Opportunity Commission ("EEOC"). He did not.

On December 20 Dr. Michael examined Shiba based on his complaints of back pain and advised that he "remain off work." After a follow-up examination on January 10, 2011, Dr. Michael reported that Shiba's "return-to-work attempt was not tolerated" because his symptoms "have been too incapacitating." The doctor again recommended that Shiba remain off work. Shiba accepted that advice and did not return to work after January 10. On January 17 the agency placed him on unpaid leave.

Shiba then notified the Department of Labor that he had suffered a recurrence of his injury and sought restoration of his workers' compensation benefits. When the Department requested further details about the nature of his condition and its connection to his previous fall in the USCIS bathroom, Shiba sent the following explanation:

> My current disability or medical treatment is related to the original work injury, because my condition has not changed[.] I was never better and always sick and complaining, and I was not returning to work unless I felt desperate to keep my job because I was terminated on June [9], 2010[,] because I was unable to return to duty. I appealed my employer[']s (USCIS) decision to the MSPB and was forced to pressure my physicians into releasing me to work against their

> recommendations … . I felt this was the only way to keep my employer from terminating me. In reality I was not ready to return to work[;] that is why I am filing for recurrence.

Shiba's workers' compensation payments resumed soon after. He remained on leave for another three and a half years.

In July 2011 the State Department received notice that Shiba had recently contacted the United Nations Refugee Agency on behalf of several Iraqi refugees. Although Shiba stated that he was doing so in his personal capacity, his email on behalf of the refugees also mentioned that he was "an Immigration Officer with Homeland Security." Based on this explicit reference to his federal employment, the Refugee Agency forwarded Shiba's email to the State Department, flagging a possible conflict of interest.

The matter eventually made its way to William Mills, the Associate Ethics Officer for the USCIS, who concluded that Shiba had violated regulations governing federal employees' use of their public office, *see* 5 C.F.R. § 2635.702, and may also have committed a federal crime, *see* 18 U.S.C. §§ 203, 205. Mills recommended referring the matter to the USCIS's Office of Security and Integrity and the Department of Homeland Security's Office of Inspector General ("OIG").

Ruth Dorochoff, the District Director for the USCIS Chicago field office, agreed and made the referrals. In an email to OIG dated September 27, 2011, Dorochoff explained that Shiba was "on complete and total disability" and said he was "unable to return to work," yet he was representing Iraqi refugees before the United Nations Refugee Agency and perhaps receiving compensation for doing so.

A two-year OIG investigation followed. Armando Lopez, the assigned investigator, interviewed Shiba, reviewed his emails and bank records, and interviewed other witnesses. At the end of the investigation, the Inspector General concluded that Shiba had (1) misused his position when contacting the Refugee Agency; (2) attempted to gain leverage with the Inspector General's Office by "present[ing] his USCIS credentials as a form of identification"; (3) falsely reported on his employment application that he had never been fired from a job (or resigned to avoid being fired) when in fact he had "resigned in lieu of being terminated by the Social Security Administration"; and (4) lied during the investigation by saying that he had not provided immigration-related assistance "to anyone other than family members." The OIG presented its findings to the U.S. Attorney's Office for the Northern District of Illinois, which declined prosecution.

About six months later, the USCIS fired Shiba. By then Thomas Cioppa had replaced Dorochoff as the District Director in the agency's Chicago office. By letter dated August 18, 2014, Cioppa terminated Shiba's employment. He explained that Shiba's status as a reemployed annuitant meant that he served "at the pleasure of the appointing agency" and the agency had decided to end his service effective August 25, 2014. Cioppa's letter did not elaborate. But in an affidavit in connection with this litigation, Cioppa explained that Shiba was fired because he had not provided any services to the agency for several years.

After his employment ended, Shiba complained to the USCIS Office of Equal Opportunity and Inclusion—first on October 8, 2014, in a complaint to an EEO counselor, and again on January 14, 2015, in a formal EEOC charge accusing

the agency of subjecting him to disability discrimination, retaliation, and a hostile workplace. Shiba's formal complaint remained pending until October 4, 2017, when an EEOC administrative judge ruled against him on each of his claims.

Meanwhile, in June 2017 Shiba applied and was tentatively selected for an assistant position at Immigration and Customs Enforcement ("ICE"), another unit within the Department of Homeland Security. The agency initiated an employment suitability determination—an initial review of a prospective employee's fitness for duty that occurs in advance of a full background investigation. In October the agency discovered adverse information about Shiba, including the results of the OIG investigation. When nearly a year passed with the background investigation still unresolved, ICE rescinded its job offer, explaining that the position was considered "mission critical."

Shiba responded with yet another EEOC charge alleging disability discrimination and retaliation. After six months elapsed without a decision, Shiba sued the Secretary of Homeland Security raising claims under the Rehabilitation Act, 29 U.S.C. §§ 701 *et seq.* He alleged that the Department failed to accommodate his disability during his failed return to work, subjected him to a hostile workplace, and retaliated against him—first by terminating his USCIS employment and again by rescinding his ICE job offer.

After lengthy discovery and an administrative reassignment of the case to a new judge, the Secretary moved for summary judgment, arguing that the claims were mostly unexhausted and also failed on the merits. The pandemic interrupted the progress of the case, but in due course the newly assigned judge granted the Secretary's motion in full.

In a comprehensive decision, the judge agreed with the Secretary that most of Shiba's claims were unexhausted because he had not timely pursued his administrative remedies. Alternatively, the judge held that Shiba's accommodation claim failed on the merits because he was not a "qualified individual" within the meaning of the statute—that is, he could not "perform the essential functions" of his job, 42 U.S.C. § 12111(8), as he himself affirmed in his application to the Department of Labor to renew his workers' compensation payments. The hostile-workplace claim likewise failed for lack of factual support; nothing in the record suggested that Shiba had suffered severe or pervasive workplace harassment. The judge also rejected Shiba's retaliation claims because the record did not support his assertion that the agency's decisions to end his USCIS employment and withdraw the ICE job offer were motivated by his protected activity.

## II. Discussion

On appeal Shiba has dropped his retaliation claims; he no longer contends that the Department terminated his USCIS employment and rescinded the ICE job offer because of his protected activity. He focuses solely on his claims that the agency failed to accommodate his disability during his brief return to work in late November 2010 and subjected him to a hostile work environment. We limit our analysis accordingly. We review the summary-judgment order de novo. *Mahran v. Advocate Christ Med. Ctr.*, 12 F.4th 708, 712 (7th Cir. 2021).

### A. Exhaustion

Federal employees must exhaust administrative remedies before filing suit for violation of the Rehabilitation Act.

*McHale v. McDonough*, 41 F.4th 866, 869 (7th Cir. 2022); *Teal v. Potter*, 559 F.3d 687, 691 (7th Cir. 2009); *McGuinness v. U.S. Postal Serv.*, 744 F.2d 1318, 1319–22 (7th Cir. 1984); *see Bartlett v. Dep't of the Treasury (IRS)*, 749 F.3d 1, 8 (1st Cir. 2014).[1] As relevant here, EEOC regulations require an aggrieved employee to seek administrative relief within 45 days of "the date of the matter alleged to be discriminatory." 29 C.F.R. § 1614.105(a). The 45-day deadline poses a problem for Shiba because most of the events he relies on to support his claims occurred between 2010 and 2013, but he didn't initiate a complaint with a counselor at the USCIS Office of Equal Opportunity and Inclusion until October 8, 2014.

More specifically, Shiba's claim for failure to accommodate is premised on the actions of Martha Medina, one of his supervisors, during his failed return to work from late November 2010 to mid-January 2011. With respect to this claim, his October 2014 complaint to the EEO counselor was unquestionably untimely. The accommodation claim is barred as unexhausted.

Shiba's hostile-workplace claim casts a somewhat wider evidentiary net, at least as he frames it. He alleges that the

---

[1] Our cases have not always been consistent on whether administrative exhaustion is required for *all* claims under the Rehabilitation Act. *See Swain v. Wormuth*, 41 F.4th 892, 896 n.2 (7th Cir. 2022). The lack of clarity does not, however, affect suits by federal employees. As noted above, we've held that federal employees must exhaust administrative remedies prior to filing suit under the Rehabilitation Act. The inconsistency appears to primarily concern exhaustion as a prerequisite to suits against private recipients of federal funding. *See Williams v. Milwaukee Health Servs., Inc.*, 732 F.3d 770, 770–71 (7th Cir. 2013). This case does not raise that question. Shiba concedes that he was required to exhaust administrative remedies.

agency subjected him to a hostile work environment by virtue of the following: (1) Medina's antagonistic treatment of him during his return to work from late November 2010 to mid-January 2011; (2) Dorochoff's OIG referral on September 27, 2011; (3) certain actions of the OIG investigators throughout 2012 and 2013; and (4) Cioppa's decision on August 18, 2014, to terminate his USCIS employment effective August 25.

As an initial matter, we note that all but the first of these actions took place during a multiyear period when Shiba was on leave and not working at all. To prove his hostile-workplace claim, Shiba must have evidence that he was subjected to an "objectively and subjectively offensive" work environment plagued by "'severe or pervasive' harassment." *Yochim v. Carson*, 935 F.3d 586, 593 (7th Cir. 2019) (quoting *Boss v. Castro*, 816 F.3d 910, 920 (7th Cir. 2016)). Only one of Shiba's evidentiary datapoints—Medina's alleged antagonism—occurred at a time when he was reporting for duty at his workplace, and his EEO complaint came too late to preserve a hostile-workplace claim concerning that conduct. We struggle to see how events that occurred during a years-long *absence* from the workplace can support a hostile-workplace claim; everything that occurred while Shiba was on leave strikes us as irrelevant to this claim.

Setting that problem aside, only the last of these events—the termination of Shiba's USCIS employment—occurred within the 45-day period before his complaint to the EEO counselor. The loss of a job is a discrete act and constitutes a separately actionable employment decision. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002). Because each discrete discriminatory act starts a new exhaustion clock, acts

that have not been challenged when the filing deadline expires "are untimely filed and no longer actionable." *Id.* at 115.

Hostile-workplace claims, on the other hand, are different in kind from claims involving discrete employment actions. "Their very nature involves repeated conduct." *Id.* As the Supreme Court explained in its decision in *Morgan*, "the incidents constituting a hostile work environment are part of one unlawful employment practice." *Id.* at 118. Accordingly, a hostile-workplace claim is administratively exhausted so long as an aggrieved employee seeks timely review of "at least one act" comprising his claim. *Id.* at 122.

We have sometimes referred to this principle as the "continuing violation" doctrine. *See, e.g.*, *Barrett v. Ill. Dep't of Corr.*, 803 F.3d 893, 898 (7th Cir. 2015); *Swanson v. Village of Flossmore*, 794 F.3d 820, 826 (7th Cir. 2015). Shiba invokes this doctrine to argue that his hostile-workplace claim was properly exhausted.

We disagree. The continuing-violation doctrine applies only to the extent that the allegedly hostile actions are "part of the same claim." *Morgan*, 536 U.S. at 118. If the later actions have no relation to the earlier ones, or if the employer intervened between them to disrupt the hostile environment, then the actions belong to separate employment practices and the plaintiff cannot recover for the earlier events that he failed to timely exhaust. *Id.*; *see Ford v. Marion Cnty. Sheriff's Off.*, 942 F.3d 839, 852 (7th Cir. 2019).

Several factors guide this "relatedness inquiry." *Ford*, 942 F.3d at 852 (quotation omitted). "The simplest factor is time: A significant gap between alleged incidents of discriminatory harassment can sever the hostile work environment

claim." *Id.* Also relevant is a change in management and, as noted, any corrective action taken by the employer. *Id.* at 853.

With these factors in mind, we see no connection between the incidents Shiba relies on as support for his claim that he was subjected to a hostile work environment. Each separate episode—Medina's alleged antagonism, Dorochoff's OIG referral, the actions of the OIG investigators, and Cioppa's termination of Shiba's USCIS employment—are not at all similar in kind. And the gaps between them are as large as two years. Actions that are so "discrete in time or circumstances that they do not reinforce each other cannot reasonably be linked together into a single chain." *Lucas v. Chi. Transit Auth.*, 367 F.3d 714, 727 (7th Cir. 2004) (quotation omitted). Gaps that span multiple years stretch the continuing-violation doctrine "beyond any workable limit"; the events that mark their beginning and end "simply cannot be considered part of the same hostile environment practice." *Id.*; *see Milligan-Grimstad v. Stanley*, 877 F.3d 705, 713 (7th Cir. 2017).

Moreover, the actions on which Shiba rests his hostile-workplace theory were not "perpetrated by the same managers." *Morgan*, 536 U.S. at 120 (quotation omitted). Dorochoff was serving as District Director when Shiba returned to work in 2010, and she referred him to the Inspector General in 2011. But that's where her involvement ends: The OIG is a separate agency within the Department of Homeland Security, and Dorochoff had no role in its investigation. And by the time Shiba was fired in 2014, Thomas Cioppa had taken over as District Director. That different managers were responsible for the acts that form the basis of the claim is yet another strong indicator that they do not belong to the same

employment practice. *See Ford*, 942 F.3d at 853; *Hambrick v. Kijakazi*, 79 F.4th 835, 842 (7th Cir. 2023).

In short, Shiba's hostile-workplace claim rests on several discrete acts or episodes, each of which triggered its own exhaustion clock. *Ford*, 942 F.3d at 854. Only the last of these acts—the termination of his USCIS employment—took place within the 45-day period preceding his EEOC complaint. Because that event was a discrete act and not part of a single unlawful employment practice, the continuing-violation doctrine does not apply. The hostile-workplace claim is likewise barred as unexhausted.

**B. Merits**

Exhaustion aside, Shiba's claims are also meritless. The Rehabilitation Act prohibits federal agencies and recipients of federal funding from discriminating against an "otherwise qualified individual with a disability … solely by reason of her or his disability." 29 U.S.C. § 794(a). Except for the Act's heightened "sole" causation requirement, the Rehabilitation Act borrows the liability standards set forth in the Americans with Disabilities Act ("ADA"), *id.* § 794(d) (citing 42 U.S.C. §§ 12111 *et seq.*), and the relief available under these statutes is "coextensive," *Jaros v. Ill. Dep't of Corr.*, 684 F.3d 667, 671 (7th Cir. 2012).

To prove his claim that the USCIS failed to accommodate his disability when he returned to work in November 2010, Shiba must first show that he was a "qualified individual"—defined as a person who "can perform the essential functions" of his position "with or without reasonable accommodation." § 12111(8); *see Cleveland v. Pol'y Mgmt. Sys. Corp.*, 526 U.S. 795,

806 (1999) (clarifying that the burden lies with the plaintiff). He has not carried this burden.

Key here, on just his second day back in the office, Shiba took medical leave, and he continued to do so repeatedly throughout his attempted return to work, taking a total of 17 leave days (full or partial) between November 22, 2010, and January 11, 2011. By mid-January 2011, he had resumed his long-term medical leave. He quickly reapplied for workers' compensation benefits, telling the Department of Labor that his condition "ha[d] not changed" and he was "never better and always sick and complaining." He also said that he had "pressure[d]" his physicians into releasing him for work "against their recommendations" and was in fact "not ready to return to work."

This evidence shows without contradiction that Shiba was unable to do his job. Indeed, his own words establish that he could not perform the duties of his position, "negat[ing] an essential element" of his accommodation claim. *Cleveland*, 526 U.S. at 806.

To be sure, Shiba's statements to the Department of Labor are not *necessarily* fatal to his claim. After all, the standards that govern a claim for workers' compensation aren't identical to those that govern a claim under the Rehabilitation Act. For that reason, applying for disability benefits doesn't automatically foreclose a plaintiff from later asserting that he "can do a particular job." *Opsteen v. Keller Structures, Inc.*, 408 F.3d 390, 392 (7th Cir. 2005). But Shiba must resolve the inconsistency in his contradictory positions—or as the Supreme Court put it in *Cleveland*, "proffer a sufficient explanation" for the inconsistency. 526 U.S. at 806. In other words, he must explain how a factfinder could both assume the truth of his

earlier statements and still conclude that he was fit to do his job, as he now claims. *Id.* at 807.

He has not done so. Shiba points to certain passages in his deposition testimony where he claimed that in 2010 he "was better" and could work with accommodations, but he "got worse again" because of "the issues that occurred" when he returned to work. This testimony does not reconcile his contradictory statements; quite the contrary, it only amplifies the contradiction. To restart his workers' compensation benefits, Shiba portrayed his condition as chronic and stagnant, telling the Department of Labor that his condition was unchanged from his original work injury and had never gotten better. In his deposition he claimed the opposite, testifying that his condition had meaningfully improved and later worsened. These claims are wholly inconsistent, and Shiba offers no way to reconcile them. *See Lee v. City of Salem*, 259 F.3d, 667, 678 (7th Cir. 2001) (A plaintiff may not "make contradictory representations regarding his ability to work and rationalize the conflict with no more of an explanation than his own change of mind.").

The doctrine of judicial estoppel precludes Shiba from "having it both ways." *Frazier-Hill v. Chi. Trans. Auth.*, 75 F.4th 797, 804 (7th Cir. 2023). Designed "to protect the integrity of the judicial process and to prevent litigants from playing fast and loose," judicial estoppel bars a litigant from taking (and prevailing) on one view of the facts and then asserting the opposite later. *Butler v. Vill. of Round Lake Police Dep't*, 585 F.3d 1020, 1022 (7th Cir. 2009) (quotation omitted). Shiba instead "must live with the factual representations" he made in the first instance. *Opsteen*, 408 F.3d at 392. This equitable doctrine, we have said, applies to judicial and administrative

proceedings alike. *See DeVito v. Chi. Park Dist.*, 270 F.3d 532, 535 (7th Cir. 2001).

Having attested that he was unable to work for purposes of obtaining workers' compensation benefits, Shiba is equitably estopped from taking a contrary position here. Because he cannot establish that he was able to perform the essential functions of his job—a necessary element of his accommodation claim—the district judge properly entered summary judgment for the Secretary on this claim.

That leaves Shiba's hostile-workplace claim.[2] Here too his evidence falls far short. As we've explained, a hostile-workplace claim requires evidence of an "objectively and subjectively offensive" work environment plagued by "'severe or pervasive' harassment." *Yochim*, 935 F.3d at 593 (quoting *Boss*, 816 F.3d at 920). Even if we indulge the assumption that the agency's actions during Shiba's years-long leave of absence are relevant to his hostile-workplace claim, the evidence doesn't come close to satisfying the liability standard.

Dorochoff's OIG referral was not just permissible, it was warranted, as the investigation ultimately concluded. Shiba also complains about certain actions by the OIG investigators—specifically, their surveillance of his home, scrutiny of his emails, and interviews with his family members. But that is just the stuff of which a typical misconduct investigation is

---

[2] Though we have held that a hostile-workplace claim is cognizable under the Americans with Disabilities Act, *Ford v. Marion Cnty. Sheriff's Off.*, 942 F.3d 839, 851–52 (7th Cir. 2019), we have not yet addressed whether the Rehabilitation Act also includes such a claim. We do not need to do so here. Shiba hasn't provided evidentiary support for the claim even if it is cognizable.

made. And setting aside the bare fact that he was fired, nothing about his termination from the USCIS qualifies as "hostile or abusive." *Mahran*, 12 F.4th at 715.

As for Medina's conduct, no reasonable factfinder could deem her criticism of his breaks and medical complaints so severe or pervasive as to create a hostile work environment. *See Passananti v. Cook County*, 689 F.3d 655, 667 (7th Cir. 2012) (Isolated incidents "do not rise to the level of conduct that alters the terms and conditions of employment."); *cf. Ford*, 942 F.3d at 856–57 (Neither telling an employee that "she should be required to prove her disability" nor questioning whether she was "really 'in as much pain as [she] was claiming'" created an abusive work environment. (alteration in original)). Medina did not threaten or impose any consequences on Shiba for taking breaks, and she made no other comments about his disability.

In sum, Shiba's workplace was not "permeated with discriminatory ridicule, intimidation, and insult." *Boss*, 816 F.3d at 921. Summary judgment for the Secretary was appropriate on this claim too.

AFFIRMED